Paul A. LENDMAN, Petitioner-Respondent,†

v.

Janet M. LENDMAN, Respondent-Appellant.

Court of Appeals

*No. 89–1652. Submitted on briefs April 19, 1990.—Decided
August 8, 1990.*

(Also reported in 460 N.W.2d 781.)

†Petition to review denied.

607

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Robert J. Grady* of *Fetek & Grady, S.C.,* of Racine.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Thomas W. Anderson* of *Anderson-Sumpter Law Offices, S.C.,* of Kenosha.

On behalf of the State of Wisconsin, there was an amicus curiae brief filed by *Donald J. Hanaway,* attorney general, and *Donald P. Johns,* assistant attorney general.

Before Nettesheim, P.J., Brown and Scott, JJ.

BROWN, J. Janet M. Lendman appeals from a divorce judgment. She argues that the trial court erred

608

by excluding from the marital estate the appreciated value of stock in Paul A. Lendman's closely held corporation because it was purchased with an inheritance. She also argues that the trial court was wrong in refusing to include the corporation's retained earnings as part of Paul's income for purposes of determining maintenance and support. She further argues that the trial court should have used the percentage standard for determining support. Finally, she claims that the trial court gave inadequate reasons for limiting maintenance.

We hold that although the stock was originally purchased with inherited funds, its appreciation is not inheritance and must be included in the marital estate. We also rule that the trial court did not abuse its discretion in declining to include retained earnings as part of the equation for determining Paul's income. We further hold that the trial court abused its discretion by not giving adequate reasons for limiting maintenance. We finally hold that the trial court did not abuse its discretion in deciding to forego use of the percentage standard in computing child support payments. We affirm in part, reverse in part and remand.

We will relate those facts necessary to the discussion of the inheritance question first. Later, we will state the facts pertinent to the maintenance and support issues.

## INHERITANCE ISSUE

Paul is a licensed mortician. With inherited funds, he bought the Mischler Funeral Home business in 1979. The purchase price was $190,000. Paul set up a close corporation named Lendman-Mischler Funeral Home, Inc., putting $8,500 of his inherited funds into the corporation in return for stock. Additionally, he loaned the

609

corporation $25,172.71—again, from inherited funds. Then he used the $8,500 and a portion of the money from the loan as an initial payment on the purchase of the funeral home. A note was signed for the balance, payable at the rate of $2,089.81 per month.

Over the years, the close corporation paid the monthly amount. A certified public accountant testified that the common term for this is "corporate debt retirement." At the time of trial, the unpaid balance on this promissory note had been reduced by $147,326 so that only $14,174 was due.

Both parties apparently agree that the stock has increased in value over time. Though the stock was originally valued at $8,500, it increased in value with each payment made on the Mischler debt.[1] It can be said that the value of the stock increased in proportion to monthly retirement of the debt.

The parties do not dispute that the appreciation in the value of the stock is not attributable to Janet's efforts. Nor do the parties dispute that the appreciation in the stock was the result of Paul's labors resulting in corporate income which paid for the retirement of the debt against the stock. However, the parties disagree whether this history renders the appreciation marital or non-marital. Janet argues that since only the down payment was made with inherited funds, the appreciation is marital. Paul asserts that since the appreciation is not due to any money or efforts of Janet, the appreciation is non-marital. The trial court agreed with Paul.

The issue involves statutory construction of sec. 767.255, Stats. Generally, property division upon divorce

---

[1]The $25,172.71 loan was repaid by the corporation to Paul. The money was then used for marital purposes. Both parties agree that there is no issue regarding the note.

is within the sound discretion of the trial court. *Torger-son v. Torgerson,* 128 Wis. 2d 465, 468, 383 N.W.2d 506, 508 (Ct. App. 1986). However, statutory construction is a question of law and we need not defer to the trial court's conclusion. *Id.* The application of a statute to a particular set of facts presents a question of law. *Id.* Since that is the case here, we review the issue *de novo.*

Section 767.255, Stats., provides in part:

> Any property . . . acquired by either party . . . as a[n] . . . inheritance or to have been paid for by either party with funds so acquired shall remain the property of such party and may not be subjected to a property division . . . except upon . . . hardship . . ..

We review the appreciation of the stock in light of the statute. The appreciated value of the stock comes within the purview of the statute and is non-marital if the appreciation was *directly acquired* by inheritance or if it was *purchased with funds acquired* by such means. If the appreciation was not acquired by either of the two means recited in the statute, then it is not entitled to exclusionary status. *Arneson v. Arneson,* 120 Wis. 2d 236, 245, 355 N.W.2d 16, 20 (Ct. App. 1984).

Obviously, the appreciation was not directly acquired by inheritance. To be determined, then, is whether the appreciation was purchased with funds acquired by the inheritance. We view Paul's argument as saying that because the corporation was directly acquired by inherited funds, it is exempt by virtue of the statutory language. This exempt property generated funds. The funds were used to purchase appreciation of the stock by retiring the corporate debt. Therefore, the appreciation is exempt because it was paid for with funds acquired by the corporation which itself was paid

611

for with inherited funds. The identity and character remained the same, and Janet had nothing to do with what occurred; the whole debt retirement structure stayed within the exempt corporation.

Paul is wrong. The statute allows exemption for all property paid for by inherited funds. "Inherited funds" may have paid for the initial stock, but "inherited funds" did not pay for the appreciation. The appreciation was paid for by corporate "income" generated through Paul's labors. In this regard, *Arneson* controls. In that case, we viewed income generated by an inherited asset as separate and distinct from the asset itself. *Id.* at 244, 355 N.W.2d at 20. We saw nothing in the statutes or in case law mandating that property purchased with the income of an inherited asset also be excluded from the marital estate. *Id.*

Here, the money used to pay off the corporate debt was earned income. Thus, just as in *Arneson* where property purchased by dividend income of an inherited stock was held to be marital, the appreciation purchased by earned income of a corporation acquired by inherited funds is also marital. We reverse this portion of the trial court's decision.

## MAINTENANCE ISSUES

We now turn to the facts relevant to maintenance. Paul's salary for 1984 was $39,000; for 1985, it was $33,000; in 1986, it was about $35,000. In 1987, however, he took a salary drop to $18,000 and in 1988, his salary was $21,000. Prior to July 1, 1987, the undistributed earned profits of the close corporation (retained earnings) were $12,682. By June 30, 1988, the retained earn-

ings had climbed to $60,961. For the calendar year 1988, the retained earnings of the corporation were $48,000.

Janet argued that Paul's stated salary was a ruse and that his true income was his stated salary plus retained earnings. Janet asked the trial court to find Paul's income to be his stated 1988 salary of $21,000 plus the $48,000 in retained earnings for that year or a total of $69,000.

Paul countered that his salary decline was legitimate. His accountant testified that he advised Paul to begin increasing retained earnings because the corporation's gross income was declining on a "decreasing line." In 1985, the corporate gross income was $152,000; in 1986, it was $148,000; in 1987, it was $137,000. At the same time, the cash flow obligations of the business remained constant or were accelerating. The accountant mentioned ongoing debt payment and increasing age of the auto fleet as examples. The accountant said that he advised Paul to "pull back" on salary.

The trial court specifically found that Paul's self-imposed salary cuts for the years 1987 and 1988 were "bogus." The trial court found that Paul took these salary cuts not to ensure that monies were available for the business, but because of the separation and divorce. The trial court found that Paul's true salary was the average of the three years before his self-imposed cuts plus dividend and interest income from his inheritance plus rental income, or $55,000 per year.

The trial court specifically declined to add retained earnings. It reasoned that these earnings "do have to be used for other business purposes besides salary." On the other hand, the trial court found Paul's income from the business to be about $14,500 more than he claimed.

Janet claims that the trial court was wrong to exclude retained earnings. She argues that as a sole

shareholder of the incorporated business, Paul has access to the corporation's income. She asserts that just as the trial court found Paul's stated salary for 1987 and 1988 to be "bogus," it should have found all of the retained earnings to be likewise.

Maintenance determinations are left to the discretion of the trial court and will not be disturbed on appeal unless there is an abuse of discretion. *LaRocque v. LaRocque,* 139 Wis. 2d 23, 27, 406 N.W.2d 736, 737 (1987). The exercise of discretion is not the equivalent of unfettered decision-making. *Id.* The process must depend on facts that are of record or that are reasonably derived from the record and a conclusion based on a logical rationale founded upon proper legal standards. *McCleary v. State,* 49 Wis. 2d 263, 277, 182 N.W.2d 512, 519 (1971).

We acknowledge that automatic exclusion of corporate income from the court's consideration for purposes of determining maintenance would encourage obligors to hide behind a corporate shield to avoid the payment of maintenance. We further acknowledge that just because the corporation's income is not taxed to the obligor, that fact does not end the inquiry. The term "retained earnings" is, after all, another name for "earned surplus" which is defined as that resulting from the profitable operations of the company. 19 W. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,* Glossary p. 7 (rev. ed. 1988). Therefore, retained earnings are profit.

We do not agree, however, that in every case where there are retained earnings income is always available for maintenance. Retained profit must sometimes necessa-

rily remain with the corporation instead of being immediately distributed. As stated in Fletcher:

> This surplus might be divided among the stockholders of the corporations as fast as it accumulated. In practice, however, this is not ordinarily done . . .. The general purpose of this accumulated surplus is to increase the resources, the reputation, the credit standing and the stability of the corporation . . .. From the standpoint of general stability, a substantial surplus acts as a "shock absorber" to take up the financial "jolts" encountered in its course by the corporate mechanism. If some extraordinary loss is incurred, or if a bad year turns anticipated profits into losses, an adequate surplus interposes to prevent any impairment of capital or curtailment of operations . . .. A substantial surplus also permits the easy increase of stated capital . . ..

*Id.* at sec. 4:50, pp. 543–44. Depending on the individual case, retained earnings might be a necessary adjunct of a well-managed corporation or a pretext for a one-man band shareholder to keep profits from being considered by the family court for maintenance. We decline to write a bright-line rule regarding retained earnings in favor of a case-by-case analysis to be conducted by the trial court in its discretion.

In this case, there was testimony to support the trial court's conclusion that the retained earnings were a necessary component of the corporate business. From these facts, the trial court could readily conclude that the retained earnings were for a legitimate and intended purpose—to act as a potential "shock absorber" in the face of continually declining earnings and to permit the capitalization of the surplus.

615

To the extent that Paul did transfer some of his salary to retained earnings as a hedge against the domestic situation, the trial court found Paul's salary to be an average of the years 1984–86 or about $35,600. Thus, in effect, the trial court did not exclude all the retained earnings. It found that Paul's salary was about $14,500 more than he said it was. Presumably, some of that lost salary is in retained earnings. We hold that retained earnings do not, as a matter of law, have to be considered income for maintenance purposes. We further hold that the trial court did not abuse its discretion in deciding the issue. The trial court's decision is the product of a rational mental process by which the facts of record and the law were appropriately considered.

Janet also faults the trial court for limiting maintenance to four years. She cites *LaRocque* in arguing that the trial court failed to consider the "fairness objective" outlined in that case. She argues that this was a marriage of twenty-eight years, that she sacrificed her professional career as a nurse to be a homemaker, and that she will earn between $21,000 to $25,000 as opposed to Paul's approximately $55,000 when she is able to work full time after her minor child is eighteen. She observes that Paul's earning capacity is twice what hers will be. She asserts that he will be able to have enough funds to enjoy the same if not a better life-style than that which he had during the marriage, while her life-style will be far less than his. She concludes that it would be unfair to terminate maintenance after four years.

Paul disagrees with Janet and argues that the four-year term coincides with the point at which the last minor child will reach the age of majority. Once this is accomplished, Janet will be able to work full time at a salary of about $28,000 per year. Additionally, she has recently received a $30,000 inheritance and will also

receive $50,000 from Paul as part of the property division, suggesting that she has some liquidity.

The trial court implicitly found that the standard of living of the parties during the marriage was based upon an annual income of $65,000—$55,000 from Paul and $10,000 from Janet's part-time job. It further found that after the minor child is eighteen, Janet can work full time. It concluded that "following the child's majority or graduation from high school the respondent would have the ability to maintain full employment and would no longer need maintenance from the petitioner."

The sole reason given by the trial court was that Janet will not need maintenance after four years. Presumably, the court believed that the money she will earn as a full-time nurse plus the inheritance and property division will be such that she will have an appropriate standard of living.

██

We hold that this determination is inadequate under current law. *LaRocque* states factors that the court must consider in determining whether to limit maintenance:

> [T]he circuit court must take several considerations into account, for example, the ability of the recipient spouse to become self-supporting by the end of the maintenance period at a standard of living *reasonably similar to that enjoyed before divorce;* the ability of the payor spouse to continue the obligation of support for an indefinite time; and the need for the court to continue jurisdiction regarding maintenance.

*LaRocque,* 139 Wis. 2d at 41, 406 N.W.2d at 743 (emphasis added).

The trial court stated that Janet will not need maintenance after four years, but the decision is silent about

whether her income in four years will be at a level reasonably similar to that enjoyed before divorce. The decision also fails to discuss Paul's ability to continue support and the need for the court to continue jurisdiction regarding maintenance. We remand for that determination.

## SUPPORT

Janet raises the same issues respecting retained earnings in the support determination that she did concerning the maintenance issue. We have already addressed them. Additionally, she argues that the trial court abused its discretion by declining to use the percentage standard outlined in Wis. Adm. Code sec. **HSS 80.**

Pursuant to sec. 767.25(1j), Stats., the trial court must determine child support payments by using the percentage standard established by the Department of Health and Social Services. An exception is found under sec. 767.25(1m), allowing courts to depart from the percentage standard upon a finding that the standard is unfair to the child or requesting party.

The trial court adopted the exception for this case and we hold that it was a proper exercise of discretion. The trial court found that Paul's income fluctuated in relation to the business. Using a percentage standard would mean that the amount of support would change as often as his income fluctuated. The trial court held that it would be in the child's best interests to have a set amount of support. The holding is affirmed.[2]

---

[2]The attorney general, acting as amicus curiae on behalf of the Department of Health and Social Services, has submitted a brief on the retained earnings issue as it regards child support.

To conclude, the trial court erred by declining to include the appreciated value of the stock in the marital estate. The trial court did not abuse its discretion regarding the exclusion of retained earnings in setting either maintenance or support. However, the trial court did not adequately state the reasons for limiting maintenance. It did nothing improper in declining to use the percentage standard. We remand for a re-evaluation of the property division and a review of the decision to limit maintenance. Because property division, support and maintenance are all interrelated, the trial court may in its discretion review all areas.

Costs are denied to both parties.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

---

The attorney general notes that sec. 767.25(1j), Stats., states that "[e]xcept as provided in sub. (1m), the court shall determine child support payment by using the percentage standard established by the department of health and social services under s. 46.25(9)(a)." Pursuant to sec. 46.25(9)(a), Stats., the department was instructed to adopt rules relating to the percentage standard. One of the rules adopted is a definition of gross income. The attorney general asserts that retained earnings come under the definition of gross income and therefore should be included in arriving at the proper percentage of child support. We have not discussed the attorney general's claim in more detailed fashion here. Whatever the merits, they are not germane to the case before us because the trial court expressly declined to use the percentage standard. Because we cannot find that the trial court's act in refusing to use the percentage standard was wrong, the attorney general's argument must await a different case.